Filed 12/5/14  P. v. Oliver CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>TREMAINE DAVID OLIVER,<br><br>    Defendant and Appellant. | A135429<br><br>(Contra Costa County<br>Super. Ct. No. 51009877) |

## I.  INTRODUCTION

Defendant Tremaine David Oliver was convicted of kidnapping for robbery (Pen. Code, § 209, subd. (b))[1]; robbery (§ 211, 212.5, subd. (c)); kidnapping for rape (§ 209, subd. (b)(1)); torture (§ 206); forcible rape in concert (§ 264.1); and forcible oral copulation in concert (§ 288a, subd. (d)).  The jury found true an enhancement for causing great bodily injury with respect to the torture, rape in concert and forcible oral copulation charges.  In addition, the jury also found true, pursuant to the One Strike Law, that defendant personally inflicted great bodily injury and torture and had also kidnapped the victim.

The trial court sentenced defendant to 17 years in state prison for the robbery and forcible oral copulation in concert, with an enhancement for great bodily injury.  With regard to the forcible rape in concert conviction, the trial court sentenced defendant to an indeterminate term of 30 years to life, which included an enhancement for great bodily

---

[1]All further statutory references are to the Penal Code, unless otherwise noted.

injury and a term of life with the possibility of parole for the torture conviction. The trial court stayed the sentence on kidnapping for robbery and kidnapping for sexual purposes, pursuant to § 654.

In this appeal Oliver argues (1) the trial court erred in denying his motion to represent himself pursuant to *Faretta v. California* (1975) 422 U.S. 806, 821 (*Faretta*); (2) substantial evidence does not support his conviction; (3) he was denied due process because the trial court denied his requests to inquire into the victim's drug and sexual history; (3) the trial court erred when it instructed the jury not to speculate about the identity of anyone the victim may have had consensual sexual relations with; (4) his conviction and sentence for robbery must be set aside because it is time barred; (5) the court erred in denying his motion to dismiss for untimely prosecution; (6) the trial court erred in denying his new trial motion; (7) the court erred in rejecting a number of jury instructions he requested; and, finally, (8) counsel was ineffective.

With the exception of defendant's argument that his robbery conviction must be set aside as time barred, a point the People concede, we reject these arguments and affirm the judgment.

## II. FACTUAL AND PROCEDURAL BACKGROUND

The victim, Jane Doe, who was 52 when she testified, described the events that occurred between the late night of June 9, 2001, and the early morning of June 10, 2001. Jane Doe testified that she was walking through Crescent Park, in Richmond, California, on her way to her cousin's house. She was wearing a black and white wool jacket with a hood. Two men jumped out in front of her and asked her what she was doing and where she was from. They talked for a minute. One of the men "was smiling, had gold teeth."

Jane Doe said good night and turned toward the street that ran along the park. As she got to the back gate of some apartments past the park, she heard someone running in her direction. Before she could look back, someone grabbed her by the neck, dragged her into the park and repeatedly kicked her. The men searched the pockets of her jacket and found a lighter. They called her names and although she fought back, they grabbed her so hard that she could not breathe. One of the men took the lighter out of her pocket,

2

grabbed her by the hair, and set her hair on fire. Then the men raped her, kicked her and hit her. She didn't know how many times they struck her or set her hair on fire. She couldn't see who was doing it. Several men were behind her and one was standing in front of her.

At some point, the men forced her to go to another part of the park. She was "dizzy and I could barely see. I remember there being cold concrete and seeing a part of the building. And once in a while they hit me, or I'm trying to move and they don't want me to, they hit me—kicking me, it was more kicking, more hitting. I don't know what it was. And I knew I was by a building." At that point, she was certain there were two men and she thought she heard another man later.

When they arrived at the building, the men continued to beat and sexually assault her.[2] She passed in and out of consciousness. They tore some of her clothes off, including her pants.

Describing the assault was very difficult for her. She had nightmares about it and found it difficult to talk about it in front of strangers. She remembered discussing the attack with Detective Gray from the Richmond Police Department in March 2009. At that time, she told him what she could remember about the attack. Other than the fact that her attackers were young black men, she could not see them, in part because it was dark and in part because she had "blacked it out."

With regard to the identity of her attackers, Jane Doe testified that although it was dark during the assault and she had difficulty seeing her attackers, she told a nurse who examined her after the assault, and over seven years later she told Gray during an interview, that she believed her "main" attacker was the man with the "gold teeth," who had jumped out at her in the park. She testified "that teeth is in my dreams, my

_____

[2] Jane Doe described these sexual attacks more specifically as follows: "I did oral and they did—they penetrated." She later specified that this penetration was vaginal and possibly anal. She also identified "the gentleman with the gold teeth" as the person who made her perform oral sex.

3

nightmares. It stands out. And that's why I could recognize . . . those teeth, gold teeth, out of all that, them gold teeth."

Jane Doe described the men as African-American and in their early 20's. One of the attackers "was kind of tall, thin, had—with the gold teeth things in their mouth. And the other one was a little shorter and dark skinned." She identified the tall man with the gold teeth as the man who made her masturbate him until he ejaculated. This man, according to Jane Doe, "stood out." He was the "main one that was doing all the hitting and kicking . . ." and he was the one who lit her hair on fire.

Cymande Russell, who lived near the Crescent Park Apartments in Richmond, testified that on the morning of June 10, 2001, she was walking through the park near the apartments. She heard a woman she later identified as Jane Doe moan "Oh help me, help me." She saw smoke coming from the woman's hair. The woman's face was burned. The woman also pointed to the community center through the park as though she was saying "somebody over there." Russell called 911 and waited for the police to arrive.

George Newton, who was employed as a police officer by the City of Richmond, was dispatched to the park where Russell found Jane Doe. When he arrived, the fire department was already on the scene attending to Jane Doe. Jane Doe "had a completely closed left eye, swollen shut. She had a large bruise under her right eye. She was bleeding from her left eye from the corner down to the cheek area. [¶] . . . the right side of her head, her hair had been burned—or appeared her hair had been burned. She had blood down the front of her clothing. Her pants were unzipped, her pubic hair was visible and she appeared distraught."

Jane Doe was transported to the emergency room at John Muir Hospital in Walnut Creek and then admitted to the hospital. Newton interviewed Jane Doe for an hour to an hour and a half at the hospital. Doe's "speech was somewhat delayed, very low toned, slurred." She was difficult to understand because "her face and her head [were] extremely swollen, her lips were swollen. She had received a beating. She was also under medication . . . so she had been sedated." During the interview Jane Doe did not mention anything about gold teeth.

Detective Delon Jackson of the Richmond Police Department testified that he was also dispatched to the park where Jane Doe had been found. His role was to "collect evidence and take photos." Jane Doe pointed to the north side of the community center as the place where she had been attacked. Jackson went to that area and "saw some hair, some blood, a bra, and condom." He also saw what he described as a "burnt area" where there was burned hair and some white tennis shoes. In addition to these items, he also found a condom wrapper, a white sock, a black hair wrap, white underwear, a chunk of hair "that was around a puddle of blood." He collected these items and booked them into evidence.

Dr. Ritu Malik, an emergency room doctor at Contra Costa County Regional Medical Center who oversaw the Sexual Assault Response Team (SART) at the Medical Center, where Jane Doe was ultimately transferred, reviewed Jane Doe's medical records relating to her assault and her subsequent treatment. On June 10, 2001, when she was admitted to the emergency room at John Muir Hospital, Jane Doe suffered from "[b]lunt facial and head injury, thermal burn of the scalp." She had "[d]iffused swelling of the left side of the face, and orbital swelling. And the laceration on the medial part of the lower eyelid. A second-degree partial thickness burn on the back of the head, with a loss of a good deal of hair on the back of the head." She had third degree burns on her earlobe. She appeared sleepy, and would only occasionally answer a question. Her speech was slurred, "slowed and barely audible." She was catheterized at the time of her arrival. The external surface of her vaginal area was sterilized with betadine in order to prevent infections.

On June 10, 2001, Traci Eaton, a registered nurse, was sent to John Muir Hospital to perform a sexual assault examination on Jane Doe. Eaton was unable to conduct this exam because Jane Doe could not be roused to give her consent. She performed the exam the next day on June 11, 2001.

Eaton testified based on this exam that Jane Doe suffered from "areas of tenderness along the ribcage," she had also sustained bruises and abrasions on her right and left arms, her back, hands, knees, legs and neck. Her left eye was shut with stitches

5

and there was also swelling around her lip. There were "different sorts of matter" noted in the external part of the vagina as well as tenderness in that area.

Jane Doe told Eaton that she had been sexually assaulted by three black men in their early 20's. They labeled the assailants "No. 1, No. 2 and No. 3." The only thing she was able to specifically tell Eaton about her assailants was that No. 1 had gold teeth. Jane Doe reported that she had been vaginally and digitally penetrated. She reported that she had not been anally penetrated nor had there been oral copulation. Assailant number 1 had forced Doe to masturbate him to ejaculation, which he did on her genitals. She indicated that either No. 2 or No. 3 had used a condom. No. 1 had threatened to kill her with a gun and when he lit her hair on fire with a lighter "he kept saying he would kill me."

Eaton testified that Jane Doe's genitals had been wiped and washed upon her admission to the hospital. Doe was "sleepy . . . rousable, cooperative. She had a flat affect. [¶] She was difficult to understand her speech at times. Majority of her hair was missing. Both of her eyes were swollen, the left one was swollen shut, and she had dried blood around her nostrils and her upper lip."

Eaton's physical exam revealed that, in addition to abrasions, scratches, bruises and areas of tenderness on her face, shoulders, ribs, thighs, shins, feet, arms, hips and neck, Jane Doe had burns on her ear and scalp. Eaton was unable to perform a genital exam because Jane Doe was in too much pain to submit to one, and the appropriate equipment for doing so without causing her that sort of pain was not available at John Muir Hospital, where Jane Doe had been admitted. Eaton noted, however, that Jane Doe reported experiencing pain and tenderness that was typical of blunt force trauma in the genitals typical of a sexual assault.

Eaton used an instrument called a Wood's lamp, or black lamp, which illuminates some bodily secretions, in her examination of Jane Doe. She noted an area on Doe's right upper arm that glowed when she used the lamp. She took a swab of that area. She also took oral swabs, four external vaginal swabs, fingernail scrapings, as well as a control swab from an area she believed to be clear of bodily secretions. She was unable

6

to obtain a swab from inside Jane Doe's vagina. She labeled the swabs, waited for them to dry, double checked the labels, and put them into an envelope to be handed to the police detective assigned to the matter.

Jane Doe was in the intensive care unit at John Muir Hospital for two days and then admitted to the Medical Center on June 13, 2001. She was discharged on June 27, 2001. While she was there, she underwent physical and occupational therapy. The extent of her injuries required that she learn to walk from her bed to the bathroom. This therapy did not, however, completely "cure" her symptoms. Upon discharge she continued to suffer from left-sided weakness and balance instability. She was able to get around with the aid of a walker but was "unable to attend to daily activities" because of her left-sided weakness and balance instability. She was offered care at a skilled nursing facility but elected to go to a private residence instead. At trial, Jane testified that ever since the attack, she could not walk without the aid of a cane. The hair that had been burned on her head did not grow back and since the attack she had problems with her eyesight.

Jane Doe also testified that earlier on the day of the attack, she smoked crack in "one session." She also had one or two beers during that time. That evening, she had a few drinks with someone.

Kim Willey, who was employed by the Contra Costa County Sheriff's Office Criminalistics Laboratory as a criminalist in 2002, testified that at that time she was the supervisor of the unit responsible for analyzing biological evidence and testing and analyzing DNA. On July 18, 2001, she received a sexual assault evidence kid for Jane Doe. The kit contained two envelopes that were labeled "Wood's lamp positive." In these envelope were vaginal and oral swabs taken from Jane Doe in addition to "swabs from the abdomen, swab of the left long finger, a swab of the right neck, and a control swab." She examined these swabs for the presence of sperm. Semen was only present in the swab that was labeled as the control. Willey explained that the lack of sperm in the vaginal swabs could be explained by the fact that Jane Doe had been catheterized and her external vaginal surface cleaned.

Sherrie Holes, a former criminalist and forensic serologist, who worked at the Contra Costa County Sheriff's crime lab in 2002 and conducted DNA testing, also testified regarding testing of Jane Doe's sexual assault evidence kit. On October 29, 2002, Holes received this sexual assault evidence kit. Among other things, evidence from this kit consisted of a number of oral swabs. Holes reviewed the report prepared by Kim Willey detailing Willey's biological testing of this evidence with the goal of identifying the substances contained in Jane Doe's sexual assault kit that were potentially suitable for further DNA testing and analysis. Of particular importance was the swab on which Willey identified semen, which Holes tested to develop a DNA profile. She also conducted a DNA analysis of the oral swabs taken from Jane Doe in order to create a reference sample of Jane Doe's DNA.

As a result of this analysis, she developed a DNA profile consistent with a single male sperm donor. On December 6, 2002, she uploaded the sperm donor profile to the Combined DNA Index System (CODIS) database.

David Stockwell, a former forensic supervisor in the Contra Costa County crime lab who was, from 2002 until 2007 the CODIS administrator, testified regarding the procedure for submitting a DNA profile of an unidentified offender to the CODIS. He explained that when a DNA profile was developed of a sperm donor who was not yet identified , the CODIS database would be queried "to see if an individual exists within the database that matches the genetic structure that we profiled from the sperm sample." This information was "simply typed into the computer program that allows us access to this database and we use what's called an upload. We would take our profile and upload it to the next level in CODIS, which for us is the State of California." The next step in the process would be to wait for a result. If a match was made, Stockwell would be identified of that fact. If no match was made, the Department of Justice would continue to run weekly comparisons of an unknown DNA sample with samples of identified DNA.

Stockwell testified that on October 30, 2006, he received an email notification that there had been a match between the DNA sample from Jane Doe's 2001 assault and defendant's DNA profile. Several weeks later, Richmond Police Sergeant Peixoto was

8

also informed of the match and asked to obtain a reference sample from defendant to confirm the match. Neither Stockwell nor Peixoto did so.

On July 4, 2008, defendant was arrested for attempted murder, a crime unrelated to his 2006 arrest. A search of defendant's house in Antioch that same day resulted in the discovery of a gold grill. Swabs were taken from the grill. In addition, liquid blood samples were obtained from defendant.

Rob Fromme, the City of Antioch police officer responsible for the search of defendant's house, had the swabs from the grill and the liquid blood evidence relayed to the Contra Costa County Crime Lab on August 26, 2008. He then released these items to the Department of Justice laboratory and asked them to develop DNA profiles from each. Both DNA samples were uploaded to the CODIS and on December 7, 2008, CODIS again declared a match with the 2001 sample from Doe's arm.

On December 9, 2008, Willey notified both Peixoto and Antioch police Detective Fromme, who was investigating the 2008 incident, of the match. She did not hear back from either man.

Richmond Police Detective Gray was then assigned to Jane Doe's case and in February 2009 contacted Willey and asked her to independently analyze the DNA match to confirm the CODIS conclusion that the two were identical. Willey did so and concluded there was a match with defendant.

In March 2009, Willey was provided with additional items of evidence from the original crime scene. After testing these items, she found semen on the underwear, blue jeans and condoms that were collected from the scene. Female DNA was recovered from the underwear, the jeans and the condoms. The main male DNA donor on the underwear was labeled as Male A. There was also the presence of a "very trace" contribution from another sperm donor. With regard to Jane Doe's pants, she developed three DNA sperm donor profiles. Male A was among the sperm donors on Jane Does' pants. The other two sperm donors were labeled as Male B and Male C. She also located a very low level of sperm from another donor, but could not determine a profile of that donor.

9

Willey also tested two condoms. On the external portion of the condom, she located a mixture of DNA from three sperm donors on one of the condoms. A mixture of DNA from Male A and Male C was present on this condom. With regard to the internal surface of the condom, she found a clear match with Male C. She also found a low level sperm donor, which might have matched Male A, although she could not say so conclusively.

The second condom she examined was "so stuck together and so disintegrated" that she couldn't "get into it, inside or outside. All I could do is flip it over one side, flat surface, flip it over to the other side and swab it. It was also stuck to a condom wrapper as well." Based on her examination of this second condom, she identified two sperm donors. She could not deduce a clear DNA profile of a single individual, although she testified that it appeared to be made up of DNA from Male A and Male C.

She testified that she compared the profiles from Males A, B and C obtained from these items to the profile created by Sherrie Holes for defendant in the case involving Jane Doe. Those three particular profiles were not a match for defendant's profile.

On March 5, 2009—over two years after the initial DNA match—defendant was charged with the crime in this matter.

The defense theory was that because more semen donors were found on Jane Doe's body and clothing than identified attackers, a reasonable doubt existed as to whether defendant was one of the assailants. Defendant also went to some length to establish that the gold grill the victim identified was not the same as the grill that was discovered in his house in 2008. Among other things, he proffered evidence that he did not have the financial means to buy this item at the time of the 2001 crime. Several witnesses also testified that defendant did not own or use a gold grill for his teeth at the time of the crime.

Defendant was convicted of kidnapping for robbery (§ 209, subd. (b)); robbery (§ 211, 212.5, subd. (c)); kidnapping for rape (§ 209, subd. (b)(1)); torture (§ 206); forcible rape in concert (§ 264.1); and forcible oral copulation in concert (§ 288a, subd. (d)). The jury found true an enhancement for causing great bodily injury with respect to

10

the torture, rape in concert and forcible oral copulation charges.  In addition, the jury also found true, pursuant to the One Strike Law, that defendant personally inflicted great bodily injury and torture and had also kidnapped the victim.

The trial court sentenced defendant to 17 years in state prison for the robbery and forcible oral copulation in concert, with an enhancement for great bodily injury.  With regard to the forcible rape in concert conviction, the trial court sentenced defendant to an indeterminate term of 30 years to life, which included an enhancement for great bodily injury and a term of life with the possibility of parole for the torture conviction.  The trial court stayed the sentence on kidnapping for robbery and kidnapping for sexual purposes, pursuant to § 654.

This timely appeal followed.

### III.  DISCUSSION

#### A.    *Faretta Motion*

On November 30, 2011, defendant moved for self-representation under *Faretta, supra,* 422 U.S. 806.  The court denied this motion.  Defendant now argues the court erred in so ruling because his motion was timely.  We review this issue under the abuse of discretion standard of review.  (*People v. Welch* (1999) 20 Cal.4th 701, 735.)  Having done so, we conclude there was no error.

##### 1.    *Factual Background*

Defendant's first trial date was February 1, 2011.  On that date, the court discussed with counsel matters such as when it would consider defense and prosecution motions and the appropriate way to tailor the juror questionnaire given the nature of the allegations in the matter.  Following this discussion, defense counsel requested a continuance.  This request was based on defendant's desire to "waive time and put his trial over."  Counsel explained that defendant "feels, in essence, that he would like more time to prepare for the trial.  And although it—the onset, he did not wish to waive time, now that he has seen the complexity and the seriousness of all the aspects of the trial, he does wish to waive time and put the matter over . . . ."  The People objected, pointing out

11

they were ready for trial and "[i]t would be a hardship for the victim in this case if the matter were to be continued."

The court observed that she had reached the conclusion, based on a conversation held earlier in chambers, that defense counsel was ready for trial. Defendant also weighed in on his request, stating that he believed a continuance was necessary because he had not been provided with a number of reports and documents, particularly with regard to the DNA evidence in the case and, in general, desired "to look more into my case before I go forth . . . ." The court then pointed out that defendant did not have a right to do his own DNA investigation, but rather "it is a strategy that counsel needs to decide."

Defendant then told the court "I think I should go pro per" and the court held an in camera *Faretta* hearing at which defendant articulated his concerns about the investigation that had been conducted to date and his claimed lack of receipt of documents regarding that investigation. Defendant told the court that he did not "want to get rid of my lawyer." Rather, he wanted "more time to look at this stuff . . . ." However, moments later, defendant told the court that he "wasn't withdrawing my request." The court next conducted a hearing pursuant to *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*). Counsel recited her academic credentials, which were considerable, and stated that she had found defendant "nothing but delightful, and I have enjoyed the fact that he's engaged and interested in the case." She also had filed a number of motions and given copies to defendant. She described her general strategy with regard to the DNA evidence, a strategy that took into account defendant's theories and ideas. She also pointed to her history of responding thoroughly to defendant's questions. Defendant repeated his concern with a detective's report that he believed was missing but, with regard to counsel's other comments, he had no response. Rather, he told the court "I just feel we need a little more time to look into this stuff and that's all."

With regard to the *Marsden* issue, the court stated that there did not appear to be a breakdown in the attorney-client relationship and, despite the fact that defendant appeared to have withdrawn the request, the court nevertheless found that defendant had

12

"not made the necessary showing . . . to have [counsel] removed pursuant to a *Marsden* motion." As for defendant's request for self-representation pursuant to *Faretta*, the court concluded that defendant "does not understand fully the consequences of—until I told him of the punishment, he does not understand any possible defenses he may have." The court also ruled the request, which was made on the first day of trial, untimely and observed that the request appeared to be a "tactic to delay the trial."

On February 10, 2011, the sixth day of trial, defendant made a second *Marsden* motion. On February 14, 2011, the court found that there had been a breakdown in attorney/client representation and granted defendant's *Marsden* motion. Alternate counsel was appointed and the trial was reset to September 19, 2011, and then continued to January 3, 2012.

On November 30, 2011, defendant brought his second *Faretta* motion. After noting that defendant had had adequate time to prepare for trial, the trial court asked if defendant wished to proceed in pro per. Defendant stated that he did and had "numerous amount of reasons why I need to continue this trial because me and my past attorneys . . . didn't agree on anything. So basically what I need to do is a whole entirely new investigation on this case." The court determined that significant defense investigation had already taken place and defense counsel was ready to proceed to trial on January 3.

The People objected to any continuance, noting that defendant had already brought several *Marsden* motions, and had successfully secured a change in counsel two weeks into the previous trial. The People also stated that both the defense and the prosecution were ready to go to trial. Moreover, a further delay would prejudice the People given that the victim "is often homeless," and had been difficult to maintain contact with. The crime had occurred 10 years earlier and the victim had "been waiting a very long time for this case to get to trial and for justice in this case . . . . She already had to undergo the hardship finding out the case was assigned to a trial department, we were moving toward picking a jury and starting with the evidence portion of the trial and finding out there was a legal reason why we would have to start all over again with a different defense attorney."

13

The court held an in camera hearing and noted that defendant had described his reasons for needing a continuance and that "there was a disagreement regarding trial tactics." The People then articulated another reason why a continuance would be prejudicial, namely that the original police officer in the case was "quite senior" and it was unclear whether he would be able to continue to participate in the case.

The court denied the *Faretta* motion as untimely. In so doing, it made the following findings: (1) defendant's attorney was one of the "most clever and well-prepared attorneys" in the county and that defendant had not simply adequate but rather excellent representation; (2) defendant had filed previous *Marsden* motions, including one in which he had his previous counsel replaced; (3) defendant's "reason for wanting to go pro per and a continuance" was "vague at best." The court did not find defendant "very credible at all"; (4) the time between the preliminary hearing in the matter and the present trial date was 16 months and a significant amount of work and investigation had already been done; (5) "there would be a significant disruption in the administration of justice and unreasonable delay if I did grant the motion and a continuance in this matter." The court found the prosecutor's statements regarding the difficulty in securing the witnesses credible. The court therefore denied the motion as untimely.

## 2. *Discussion*

In *People v. Lynch* (2010) 50 Cal.4th 693 (*Lynch*), overruled on another ground in *People v. McKinnon* (2011) 52 Cal.4th 610, 636-643, our Supreme Court recently reiterated the principles that govern a trial court's exercise of its discretion in ruling on a *Faretta* motion. As a basic matter, "[a] trial court must grant a defendant's request for self-representation if the defendant unequivocally asserts that right within a reasonable time prior to the commencement of trial, and makes his request voluntarily, knowingly, and intelligently. [Citations.]" (*Lynch* at p. 721.)

Nevertheless, " '*Faretta* itself and later cases have made clear that the right of self-representation is not absolute.' (*Indiana v. Edwards* (2008) 554 U.S. 164; see *Jones v. Barnes* (1983) 463 U.S. 745, 751, citing *Faretta, supra,* 422 U.S. 806 ['we have held that, with some limitations, a defendant may elect to act as his or her own advocate'].)"

14

(*Lynch, supra,* 50 Cal.4th at p. 721.) A court may deny a defendant's request to represent himself when he "is not competent to represent himself [citation], is disruptive in the courtroom or engages in misconduct outside the courtroom that 'seriously threatens the core integrity of the trial' [citations], or the motion is made for purpose of delay [citation.]" (*Ibid.*)

In addition, a *Faretta* motion "may be denied if untimely." (*Lynch, supra,* 50 Cal.4th at p. 722.) Citing its earlier decision in *People v. Windham* (1977) 19 Cal.3d 121, 127-128, the *Lynch* court observed that "a motion is timely if made 'a reasonable time prior to the commencement of trial.' [Citation.]" However, the "imposition of a timeliness 'requirement should not be and, indeed, must not be used as a means of limiting a defendant's constitutional right of self-representation.' [Citation.]" Rather, the purpose of the requirement is " 'to prevent the defendant from misusing the motion to unjustifiably delay trial or obstruct the orderly administration of justice.' [Citation.]" (*Lynch* at p. 722.)

The factors a trial court may consider in assessing the timeliness of a *Faretta* motion include " 'the quality of counsel's representation of the defendant, the defendant's prior proclivity to substitute counsel, the reasons for the request, the length and stage of the proceedings, and the disruption or delay which might reasonably be expected to follow the granting of such a motion.' [Citation.]" (*Lynch, supra* 50 Cal.4th at p. 722, fn. 10.) With regard to the question of whether there is an outside limit on the time between a request for substitution of counsel and the date of a trial, the *Lynch* court pointed out that although the United States Supreme Court had approved a timeliness limitation on the right to self-representation, it had "never delineated when a motion may be denied as untimely. Nor has this court fixed any definitive time before trial at which a motion for self-representation is considered untimely, or articulated factors a trial court may consider in determining whether a self-representation motion was filed a reasonable time before trial." (*Id.* at p. 722.)

After reviewing numerous cases regarding the specific time periods between *Faretta* motions and trial dates, the *Lynch* court concluded that "the high court's cases

15

and those of this court guide us to the conclusion that a trial court may consider the totality of the circumstances in determining whether a defendant's pretrial motion for self-representation is timely. Thus, a trial court properly considers not only the time between the motion and the scheduled trial date, but also such factors as whether trial counsel is ready to proceed to trial, the number of witnesses and the reluctance or availability of crucial trial witnesses, the complexity of the case, any ongoing pretrial proceedings, and whether the defendant had earlier opportunities to assert his right of self-representation." (*Lynch, supra,* 50 Cal.4th at p. 726.)

The trial court did not abuse its discretion in determining that defendant's *Faretta* motion was untimely and denying it on that basis. First, our review of the record indicates that trial counsel was amply prepared for trial. Second, the trial court found credible the prosecutor's representation that a delay would present hardship to the victim and make it more difficult to secure testimony as well as the testimony of a senior, and retired, law enforcement witness. Finally, not only did defendant have earlier opportunities to assert his right to self-representation, but the court rightly concluded that defendant's motion was the latest in a series of efforts to delay his trial. In his first trial, defendant sought a continuance, sought to represent himself, and brought two *Marsden* motions, the second of which was ultimately successful. Further supporting the court's conclusion that defendant's motion was part of an effort to delay trial, the court found that defendant had only a "vague" rationale for his desire to represent himself and even this rationale was not credible.[3]

Defendant argues that the court could not have reasonably concluded that his *Faretta* motion was brought for the purposes of delay because, in the interval between his first and second trial dates, he did not bring a *Marsden* or *Faretta* motion and, thus, the

---

[3] Defendant argues that his stated reasons for bringing his motion were irrelevant, because there was no evidence that his request was intended solely to delay proceedings. The simple answer to this point is that the court could in fact, find that defendant's request was intended to delay the proceedings based on defendant's past behavior as well as his "vague" rationale for bringing the current motion.

16

court could have inferred that he had abandoned any further efforts to represent himself or substitute counsel. We decline to draw this illogical inference. The trial court pointed out that defendant had in the past sought to delay his trial and at this point had only the vaguest of reasons for seeking to represent himself. The trial court not unreasonably concluded that defendant's current *Faretta* motion was part of this pattern and therefore brought for the purposes of delay.

Defendant mentions that the court commented that, should it grant defendant a continuance, there would be a further delay in the trial, and argues that this was not a rationale for denying defendant's *Faretta* motion because the court was not required to grant defendant a continuance. Our review of the record indicates that the court's hypothetical statement was not a significant factor in the court's reasonable decision to deny defendant's *Faretta* motion.

Defendant also focuses on the fact that the time between his motion (November 30, 2011, and the date set for trial, January 3, 2012) was over a month and the court should have found his motion timely based on this fact alone. However, as the *Lynch* court makes clear, the period of time between the *Faretta* motion and the trial date is neither the only nor the principal factor in a trial court's determination of timeliness. Rather, as the *Lynch* court makes clear, we consider the totality of the circumstances in which the motion is made. Under these circumstances, the court acted within its discretion in denying defendant's *Faretta* motion.

**B.** *Sufficiency of the Evidence*

Citing *Jackson v. Virginia* (1979) 443 U.S. 307, defendant argues that he was convicted on insufficient evidence in violation of the fifth and fourteenth amendments of the U.S. Constitution. We do not agree.

The DNA match of semen found on Jane Doe's arm with defendant's own DNA created a compelling case for defendant's guilt. Defendant, however, asserts that defendant's semen could have been on Jane Doe's arm because of innocent circumstances. He argues that this conclusion could be drawn from what he characterizes as a reasonable inference that because the sample on Doe's arm was small, defendant did

17

not actually ejaculate on Doe during the rape, but that Doe somehow transferred defendant's semen from some other part of her body to her arm, namely during a prior consensual sexual encounter with defendant. To summarize defendant's explanation for the presence of his sperm on the victim is to show how unreasonable it is. There is no evidence in the record to support defendant's assertion that he had earlier had consensual sex with the victim. Even if there was, under the substantial evidence standard of review, the victim's description of one of the attackers forcing her to masturbate him to ejaculation together with the DNA match is sufficient to support the conviction. That a contrary explanation might also exist does not alter this conclusion.

**C.** *Denial of Defense Motions Regarding Jane Doe's Prior Sexual History and Drug-Related History*

On a number of occasions during the proceedings, the defense sought to introduce evidence of Jane Doe's prior sexual and drug history as well as expert testimony regarding the likelihood that a woman who was addicted to crack cocaine would trade sexual services for drugs. The trial court denied these requests under Evidence Code sections 782, 1103 and 352. We review its conclusion under the abuse of discretion standard of review and find no error.

**1.** *Factual Background*

Defendant's request to introduce this evidence was based on the fact that in 2009 the victim told the police that, earlier on the day of the attack, she had consensual sex with a former boyfriend, an account the boyfriend apparently disputed. Defendant's attorney explained "the defense theory is that Jane Doe . . . lied when [over seven years after the assault] she said she had consensual sex with [former boyfriend] . . . and that she lied because of a consciousness of guilt because, in fact, what she was doing was having sex with people for drugs, and that the defense would provide evidence of that in the form of expert testimony . . . ."

18

In denying these requests,[4] the court observed that there was no evidence that the victim had consented to sex with defendant and any testimony regarding her sexual relationship with the former boyfriend, her drug use, and the connection between sex and drug use, was not only irrelevant but relied on a chain of speculation that was highly implausible. The court also found that any such testimony would be "confusing to the jury."

The court made a similar observation after the defense sought to introduce evidence regarding the defendant's sexual relationship with her former boyfriend following testimony about the profile of Male A—whose DNA profile was not loaded into CODIS. The court explained to defense counsel, "I told you from the beginning that if you have evidence, not some expert who's speculating that because she abuses crack cocaine, therefore, she must have such a habit that she craves it, therefore, that she must have sex with anybody to get crack or to get money—if you have real evidence as opposed to this chain of speculation that attacks her character, suggesting that, in fact, on that night she did have relations with other men, including your client . . ., which would explain his DNA on her, I will let you go there. [¶] But unless and until you have that, all you're trying to do is to use whatever means you can to tell this jury that she's having sex with lots of men so that they can infer that your client must have been one of them and so they can infer that, therefore, he can't be, because of the DNA hit, one of the people who did this crime to this victim. [¶] . . . [¶] And again if you have affirmative evidence that, in fact, he had consensual relations with her, I will let you go there, but you haven't shown me that yet."

---

[4] The court denied a number of defense efforts to introduce this evidence: In addition to denying defense counsel's request to cross-examine Jane Doe on her statements about consensual sex with her former boyfriend, the court also denied defense counsel's request to introduce testimony of an "expert" on the propensity of female crack addicts to trade sex for crack, and that of another expert to the effect that Jane Doe was addicted to crack cocaine at the time of the assault and that exchanging crack for sex was common behavior for an addict.

19

With regard to questions in general about whether she had consensual sexual relations with her former boyfriend that night, the court explained, "I have said throughout that you may not get into her consensual relations with [former boyfriend] on that night because it's going to her credibility and its not relevant where there—this was a gang rape, there is no dispute that this was a gang rape, there's no dispute that [former boyfriend] doesn't have the same DNA as your client. . . . [¶] . . . [¶] So the fact that she had consensual relations with [former boyfriend] is not, standing alone, exculpatory or relevant to anything. [¶] The fact that she may have been with [former boyfriend] that night . . . is marginally relevant, if that, just as it would be marginally relevant if she went to McDonald's that night. It is a circumstance that precedes what happened here. [¶] I've never said you can't call [former boyfriend] to say, no, in fact, he wasn't in the van with her that night, though she's never said it was him. Maybe that's who's in the van, maybe it wasn't."

With regard to the proffered testimony of several expert witnesses regarding the proclivity of crack cocaine users to perform sexual services in exchange for the drug, and the victim's own use of crack cocaine, the court rejected the defense's suggestion that evidence of the victim's drug use would establish that the victim must have had consensual sex with the defendant in return for money or drugs. The court observed "I've already ruled that this so-called expert, who is really not an expert on anything that is relevant here and certainly could not render an opinion that would create an inference that any jury could accept that, in fact, this individual person sitting right here was one of the persons with whom she had consensual relations, that doesn't open the door, raise the issue." The court went on to explain that the evidence the defense wished to put on "is not exculpatory, unless there's something to suggest that this defendant was somebody who had consensual sexual relations [for drugs]. [¶] So, we already have before the jury evidence that there may be more people with sperm on her than there were assailants, according to her statement. And that's something that both sides are just going to have to deal with. [¶] But as to what consensual sex she may have had and what her relations

were with other people not related to the defendant, I don't think comes in with the showing you have made.

Further, the court explained that the expert was not permitted to "opine as to her [the victim's] credibility because she may or may not have accurately reported who she was with the night before she was gang-raped." As the court succinctly stated, there was no case she knew of that allowed "an expert to reach a conclusion that a woman has sex for crack based on the kinds of thing—and therefore, her—her sexual history that way should be able to come in, notwithstanding [Evidence Code] Section 782 and 352—you haven't cited me a single case with this kind of expert testimony suggesting her character for sex for crack. [¶] If you can cite me cases that show that, fine, but you haven't shown me a single case, and it is the most absurd set of speculation I can possibly imagine. [¶] And if that's the case, then, the—then, the natural extension of that logic is that a woman who abuses crack cocaine can't be raped."

## 2. *Discussion*

In general, evidence of a victim's prior consensual sexual conduct is neither relevant to show consent on a different occasion nor to undermine the victim's credibility at trial. In other words, the fact that a victim of a sexual assault had consensual sex in the past with either the defendant or others, or had worked or was currently working as a prostitute does not generally constitute relevant evidence that the victim consented to sex on another occasion or could not credibly describe a sexual assault.

Three statutes govern this issue: Evidence Code sections 1103, 782 and 352. Evidence Code section 1103, subdivision (c)(1), provides that "opinion evidence, reputation evidence, and evidence of specific instances of the complaining witness' sexual conduct, or any of that evidence, is not admissible by the defendant in order to prove consent by the complaining witness." Evidence Code section 782, subdivision (a) provides for an exception to Evidence Code section 1103, subdivision (c)(1) in those cases where "evidence of sexual conduct of the complaining witness is offered to attack the credibility of the complaining witness . . . ." However, Evidence Code section 782, subdivision (a)(1) specifies that prior to the admission of such evidence "[a] written

21

motion shall be made by the defendant to the court and prosecutor stating that the defense has an offer of proof of the relevancy of evidence of the sexual conduct of the complaining witness proposed to be presented and its relevancy in attacking the credibility of the complaining witness." Should the "court find[] that evidence proposed to be offered by the defendant regarding the sexual conduct of the complaining witness is relevant pursuant to Section 780 [credibility generally], and is not inadmissible pursuant to Section 352, the court may make an order stating what evidence may be introduced by the defendant, and the nature of the questions to be permitted. The defendant may then offer evidence pursuant to the order of the court." (Evid. Code, § 782, subd. (a)(4).) We review the court's exclusion of this evidence under the abuse of discretion standard of review (*People v. Chandler* (1997) 56 Cal.App.4th 703, 711) and conclude no abuse of discretion occurred.

The trial court properly concluded that Evidence Code section 1103, subdivision (c)(1) makes inadmissible the fact that Jane Doe may have had consensual sex with a boyfriend earlier on the day of the attack, a fact that is not relevant to whether she consented to sexual activity with defendant.

Defendant argues, however, that this evidence went to Jane Doe's credibility and was admissible under the credibility exception set forth in Evidence Code section 782. Specifically, defendant asserts that he was not, in fact, interested in getting before the jury evidence of Jane Doe's sexual history but, rather, wanted to point to a potential lie she may have told a police officer in recounting the events of the day leading up to her sexual assault. In essence, he contends that the fact that Jane Doe might, over seven years after a brutal sexual assault, inaccurately report events that occurred earlier on the day of the attack, calls into her question her credibility as a witness. The court correctly concluded that this evidence was not relevant to the issue of Jane Doe's credibility.

Even if it was, the trial court also ruled in a proper exercise of its discretion, that this evidence was inadmissible under Evidence Code section 352. Introduction of evidence of Jane Doe's unrelated consensual sexual conduct, in a case where there was no evidence that Jane Doe had, in fact, consented to sex with defendant, would have been

confusing to the jury, would invite it to speculate about the issue of consent, and was of minimal probative value as to her credibility as a witness. As the People correctly point out, the court permitted far more probative evidence to come in regarding Jane Doe's credibility, including extensive cross-examination of Jane Doe regarding inconsistencies between her statements describing the assault and impeachment with prior convictions evidencing moral turpitude.

The court also properly denied defense requests to introduce witnesses who would opine on the connection between crack cocaine use, prostitution and consensual sex, witnesses whose testimony was designed to put before the jury the argument that the victim was a crack cocaine user, that crack cocaine users often engaged in prostitution, and therefore, the victim had done so at some point with the defendant, which would explain the presence of his DNA on her arm. There was no evidence that the victim ever had consensual sex with defendant. Accordingly, the trial court did not abuse its discretion in denying defendant's efforts to put this testimony before the jury.

Defendant argues that *People v. Varona* (1983) 143 Cal.App.3d 566 (*Varona*), supports his argument. We disagree. In *Varona,* the victim testified she was raped by several men and subjected to forcible oral copulation. (*Id.* at p. 568.) The trial court denied the defendants' request to put on evidence that the victim was "on probation for prostitution" in the area where the rape had taken place.[5] (*Id.* at pp. 569-570.) On appeal, the court reversed. After first noting that this evidence was inadmissible under Evidence Code section 1103, it held the evidence was admissible under Evidence Code section 782 to refute specific claims the victim had made about her activities in the area where the event took place. (*Ibid.*)

Here, there was no evidence that Jane Doe had ever worked as a prostitute and the trial court acted well within its discretion to exclude evidence of Jane Doe's consensual sexual activities with a former boyfriend on Evidence Code section 352 grounds as well

---

[5] In general, it is a rare case in which evidence that a victim had previously engaged in prostitution will be admissible under Evidence Code section 782. (*People v. Rioz* (1984) 161 Cal.App.3d 905, 916-917.)

on the ground it was not relevant to the Jane Doe's credibility. Nor does the trial court's decision violate defendant's constitutional right to present a defense as defendant asserts. (*People v. Snow* (2003) 30 Cal.4th 43, 90.)

**D.    *Jury Admonition Regarding Speculation***

Defendant argues that the trial court erred when it instructed the jury not to speculate "without evidence, about who the individuals may have been, if any, that the victim in this case may have had consensual relations with." We disagree.

**1.    *Background***

In closing argument, over prosecution objection, which the trial court overruled, defendant's counsel pointed out that Jane Doe testified she'd done some yard work and smoked crack on the day of the attack. Counsel told the jury "[i]f the person is willing to pull weeds for crack money, you can consider what other work that person would do." Again over prosecution objection overruled by the court, counsel told the jury "[r]emember the equation we have here. Two assailants, five donors, three donors, one reasonable interpretation of this evidence is that two of the donors were the assailants, two of the donors on Jane Doe were the assailants. Three of the donors were not the assailants. Three of the donors would be recent consensual partners." He reiterated that five different sperm samples were found on Jane Doe and that this fact raised a "reasonable doubt." Counsel was also permitted to argue that "[y]ou also need to consider what we don't know about Jane Doe. Remember the prosecution has the burden to convince you beyond a reasonable doubt that Mr. Oliver is one of those two assailants that Ms. Doe told you about. [¶] We don't know if Ms. Doe could identify any of the three donors, aside from the two assailants. We don't know anything about the circumstances of any sexual encounters with these three donors."

Defense counsel told the jury that "[w]e don't know whether the circumstances of encounters with these three donors would even permit Jane Doe with the opportunity to identify who she was having sex with or to know who she was having sex with. [¶] You're having sex in a dark alley— [¶] . . . [¶] you might not be able to identify . . . ." Again over prosecution objection, the defense argued that "[t]he only question that the

prosecution asked . . . Jane Doe about Tremaine Oliver was, in 2001 did you know an 18-year old named Tremaine Oliver? That was the question the prosecution asked. Jane Doe was never asked whether she had recent consensual sex with a younger black man."

Defense counsel's argument continued: "Jane Doe was never asked whether she could recognize, or had the ability to recognize, anyone that she had recent sex with, or whether she knew any people that she had recent sex with. Those questions were not asked. So, ladies and gentlemen, maybe Jane Doe didn't know Tremaine Oliver by name in 2001, but that does not prove beyond a reasonable doubt that she did not have consensual sex with him."

At this point, the court sustained the prosecution's objection, and admonished the jury as follows: "Members of the jury, remember that you are the sole judges of the evidence in this case. And you are the sole judges of what are reasonable and unreasonable inferences. But I will tell you that under the law you may not speculate, without evidence, about who the individuals may have been, if any, that the victim in this case may have had consensual relations with."

## 2.    *Discussion*

Defendant contends that this instruction "ordered the jury not to consider all of the relevant possibilities created by the evidence, and therefore amounted to a direction for them to find that appellant's DNA could only have been the result of being connected with the attack in some way." This, he argues, violated his right to due process. We disagree.

When reviewing such a claim, our inquiry is " ' "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution.' " (*People v. Ayala* (2000) 24 Cal.4th 243, 289.) We see no reasonable likelihood that the jury interpreted the trial court's admonition to preclude it from considering relevant possibilities raised by the evidence. The possibility that the victim had consensual sex with the defendant earlier in the day was not a "relevant possibility" because there was no evidence to support this argument. At the point where the court stepped in to admonish the jury on this point, defendant was inviting them to step outside

their role as jurors and supply facts not before them to reach the conclusion defense counsel was urging them to reach. The court did not err in admonishing the jury not to accept this invitation.

### E.    *Robbery Conviction*

Defendant was charged with robbery on March 5, 2009, more than seven years after this crime was committed and almost four years after his identity was known. Pursuant to section 801, the People were required to commence a criminal prosecution against defendant within three years after the offense was committed. The People correctly concede that defendant's robbery conviction is time barred. Accordingly it must be reversed and defendant's sentence on this count set aside.

### F.    *Motions to Dismiss for Untimely Prosecution and New Trial*

Defendant argues that the two-year, three-month delay between the filing of the complaint against him and the 2006 match of his DNA to the DNA found at the crime scene violates both federal and state due process guarantees. We disagree.

The facts that support defendant's argument that the pre-accusation delay in this case was calculated to obtain a tactical advantage and thus amounted to a due process violation are as follows: The DNA profile from Jane Doe's arm was uploaded to the CODIS on December 6, 2002. Defendant's DNA was uploaded to the CODIS in 2006 after he was arrested for an unrelated offense. In a California Department of Justice DNA Lab report dated November 6, 2006, the CODIS declared a match between the two DNA profiles.

That same day, a CODIS administrator wrote a letter to David Stockwell, of the Contra Costa County Sheriff's office regarding the match. Several weeks later, Richmond Police Sergeant Peixoto was also informed of the match and asked to obtain a reference sample from defendant to confirm the match. Neither Stockwell nor Peixoto did so.

In July 2008, defendant was again arrested, and again swabbed for DNA. A gold grill found at the scene of this crime was also swabbed for DNA. Both DNA samples

26

were uploaded to the CODIS and on December 7, 2008, CODIS again declared a match with the 2001 sample from Doe's arm.

Two months later, Kim Willey, a Contra Costa County Criminalist wrote to her supervisor and expressed frustration that the Richmond Police Department had failed to investigate this, and other DNA matches in rape cases. Willey notified both Peixoto and Antioch Police Detective Fromme, who was investigating the 2008 incident. She did not hear back from either man. Richmond Police Detective Gray was assigned to the Doe case and in February 2009 contacted Willey and asked her to independently analyze the DNA match to confirm the CODIS conclusion that the two were identical. Over two years after the initial DNA match, defendant was charged with the crime in this matter on March 5, 2009.

In its response to the motion to dismiss this case because of the delay in prosecution, the People stated only that the original investigator in this case was out on injury leave in 2006, when the first match was made and the homicide unit, which was then given the case, was dealing with a spike in homicides and violent crimes and "the end of the year is a time of natural case-load backlog." Essentially, as defendant puts it, the only explanation for the delay was that the police department was "very busy." Although we find these half-hearted explanations in no way justify the delay in this matter, because defendant was not prejudiced by the delay no due process violation occurred.

In general, "[a] three-step analysis is employed to determine if a defendant's due process right to a fair trial (Cal. Const., art. I, § 7) has been violated because of delay in filing an information or seeking an indictment: (1) the defendant must show that he has been prejudiced by the delay, whereupon (2) the burden shifts to the People to justify the delay, and (3) the court balances the harm against the justification." (*People v. Pellegrino* (1978) 86 Cal.App.3d 776, 779.) "If defendant fails to show prejudice, the court need not inquire into the justification for the delay since there is nothing to 'weigh' such justification against. This is particularly true when there is no evidence the delay was for the purpose of weakening the defense." (*People v. Dunn-Gonzalez* (1996) 47

27

Cal.App.4th 899, 911.) Prejudice must be actual rather than merely possible. (*Serna v. Superior Court* (1985) 40 Cal.3d 239, 250.)

Under this test, it is only when a defendant meets his burden of showing actual prejudice that the prosecution must justify the delay. The trial court then balances the harm to the defendant against the justification for the delay in order to determine if there has been a due process violation. Here, the trial court correctly concluded that defendant failed to meet his initial burden of showing actual prejudice.

We review this factual finding under the substantial evidence standard of review.[6] In 2008, defendant was convicted of an attempted murder that took place in Antioch. Defendant argued that he suffered actual prejudice because had he been arrested for the rape of Jane Doe in 2006, he would not have committed the 2008 crime—presumably because he would have been in custody and thus not free to do so.

At the hearing on the motion to dismiss, defendant testified that he was prejudiced because he was unwilling to testify in his own defense at trial and run the risk of being impeached by the conviction for this earlier crime.

Defendant's prejudice argument boils down to this: the only reason he committed the 2008 attempted murder was because he was not incarcerated. In other words, defendant argues that it was inevitable he would use his freedom to sexually assault Jane Doe. This argument is so lacking in logic and common sense that to state it is to refute it. Defendant committed the 2008 crime because he chose to do so, not because he was at liberty to do so. Defendant makes a similar argument in claiming that he was prejudiced because he accepted a plea bargain in the earlier case, which then limited his ability to testify in his defense in this matter because of a fear of impeachment. At the core of this argument is the same assumption: defendant's criminal behavior could have been prevented only if he had been incarcerated promptly and, therefore, he was prejudiced because he chose to violate the law before he was arrested, and entered into a plea with

---

[6] The court evaluated defendant's motion to dismiss at the end of the trial in order to more fully assess the question of prejudice to defendant.

28

regard to that crime. This argument meets the same fate as his earlier version of it: we reject it.

Finally, defendant cites *Dickey v. Florida* (1970) 398 U.S. 30 (*Dickey*) in support of his argument that, although the delay in prosecution in this case was not the product of desire to gain a tactical advantage, it nevertheless can amount to a due process violation. *Dickey* is inapposite. In contrast to this case, the defendant was "available to the State at all times during the seven-year period before his trial" and, during that time period, the defendant made repeated efforts to secure a prompt trial. Moreover, the prejudice to the defendant in *Dickey* was considerable. Specifically, "[i]n the interval two witnesses died and another potential defense witness [was] alleged to have become unavailable. Police records of possible relevance [were] lost or destroyed." (*Dickey, supra,* 398 U.S. at p. 36.) Here, of course, defendant failed to show he was prejudiced by the delay in this case. The trial court properly denied this motion.

**G.    *Denial of Defense Requests for Jury Instructions***

**1.      *Propensity Evidence:  CALJIC No. 2.50.01 Modification***

Defendant requested that the court modify CALJIC No. 2.50.01 to add language that would permit the jury to infer from the absence of evidence he had committed a sexual offense, he did not have a propensity to commit such crimes.[7] CALJIC No. 2.50.01, of course, permits the jury to reach the opposite inference: that is, the jury may infer from the fact of a defendant's prior sexual offenses that he has a propensity to commit such crimes. The trial court properly denied this request, pointing out that the inference defendant sought to draw from the absence of a prior record of committing

---

[7] The instruction defendant requested is as follows: "The law permits the People to introduce evidence showing that the defendant has engaged in a sexual offense other than the offenses charged to establish that the defendant has a disposition to commit sexual offenses. [¶] The People have not introduced any evidence in this case to suggest that the defendant has ever engaged in any sexual offense other than those charged. [¶] Therefore, you may infer that the defendant has no disposition to commit sexual offenses. If you find that the defendant has no disposition to commit sexual offenses, you may infer that he was not likely to commit and did not commit the sexual offense crimes charged in this case."

sexual offenses was not a logical one. As the court succinctly pointed out, the instruction defendant sought "would lead to the anomalous idea that you get one free rape. In other words, unless or until . . . you've engaged in a sexual offense . . ., a jury could find that you don't have a propensity to commit a sexual offense."

The cases defendant relies on in support of his argument are inapposite. In *People v. Mullens* (2004) 119 Cal.App.4th 648, 662 (*Mullens*), the court admitted testimony regarding an incident involving a lewd act against a minor, but excluded evidence that the defendant had been acquitted of a charge of a lewd act against a minor "based on that incident." The *Mullens* court concluded that the trial court had erred, citing our Supreme Court's ruling in *People v. Griffin* (1967) 66 Cal.2d 459 "that 'the better rule allows proof of an acquittal to weaken and rebut the prosecution's evidence of the other crime [citation] . . . .' " (*Mullens, supra,* 119 Cal.App.4th at p. 665.) Here, the evidence defendant sought to introduce was not of the same character. As the trial court so pointedly said, the *lack* of evidence that a defendant had committed a crime amounts to nothing more than giving a defendant "one free rape." Moreover, merely the absence of evidence of criminal behavior is not inculpatory (as the People note, this is simply the presumption of innocence), while evidence of an acquittal is relevant to rebut the prosecution's evidence of similar, prior criminal conduct. *People v. Callahan* (1999) 74 Cal.App.4th 356, 360 is similarly inapplicable. In *Callahan*, the court held that when the prosecution introduces character evidence under Evidence Code, section 1108, subdivision (a), "the defendant is permitted to introduce any or all of the three types of character evidence—opinion evidence, reputation evidence, and evidence of specific incidents of conduct." (*Callahan* at p. 379.) As in *Mullens*, this is the sort of evidence that may be admitted to rebut character evidence. The trial court properly rejected defendant's proposed instruction.

### 2. *Pinpoint Instruction Regarding DNA Evidence (CALJIC No. 2.11)*

Defendant requested that the court modify CALJIC No. 2.11 to add the following language: "The prosecution has introduced evidence of the results of scientific testing of control swab 1-1(h) in this case. That swab was entirely consumed by that scientific

testing. There is nothing improper per se about the fact that this sample was entirely consumed during this testing, but this fact does mean that the defendant did not have the opportunity to have separate and independent testing of a portion of control swab 1-1(h) in order to determine if such independent testing would yield the same result or a different result. You are entitled to consider this lack of opportunity for independent testing by the defendant in deciding how much weight if any, to give to the evidence introduced by the prosecution."

The trial court properly denied this instruction, under the general principle that it "need not give a pinpoint instruction if it is argumentative" (*People v. Bolden* (2002) 29 Cal.4th 515, 558), "that is, an instruction 'of such a character as to invite the jury to draw inferences favorable to one of the parties from specified items of evidence.' " (*People v. Mincey* (1992) 2 Cal.4th 408, 437.) Given that the nature of this instruction was to do precisely that, the court did not err here.

### 3. *CALJIC No. 2.01*

Defendant further requested a modification to CALJIC No. 2.01. Defendant contends that this modification improves that instruction's use of the terms "guilt" and "innocence." This issue was settled in *People v. Crew* (2003) 31 Cal.4th 822 a case in which our Supreme Court rejected this argument. As in *Crew*, there was here no "reasonable likelihood that the jury misapplied or misconstrued the instruction." (*Id.* at p. 847.) Moreover, as in *Crew,* the jury was repeatedly instructed on the proper burden of proof.

### 4. *CALJIC No. 2.90*

Defendant's argues that the trial court erred because it did not make a requested modification of the standard reasonable doubt instruction. This argument was rejected in *People v. Farley* (2009) 46 Cal.4th 1053, 1123, and we do so here as well.

### H. *New Trial Motion*

Defendant concedes his new trial motion raised the same issues he now asserts on appeal. Having considered and denied each of his arguments with regard to these issues,

we also reject his claim that the trial court erred when it did not grant his new trial motion.

**I.** *Ineffective Assistance of Counsel*

Defendant argues in only the most general sense that counsel may have been ineffective in waiving or forfeiting arguments and that counsel may have not been "consistent" in putting before the jury the defense theory regarding consensual sex. He does not, however, point to any specific inconsistency. Having failed to do so, we reject his argument. (*Strickland v. Washington* (1984) 466 U.S. 668, 690 [defendant making ineffective assistance argument required to "identify the acts or omissions of counsel"]).

## IV. DISPOSITION

With the exception of the robbery charge, which we reverse, and the three-year prison term for that crime, which we set aside, the judgment is affirmed.

_____
Kline, P.J.

We concur:

_____
Richman, J.

_____
Stewart, J.

32